**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-01514-RMR-SBP

JEFFERSON STREET HOLDINGS, LLC,
d/b/a cradl. ltd.,

      Plaintiff,

v.

OTTER PRODUCTS, LLC,

      Defendant.

---

### ORDER DENYING MOTION TO DISQUALIFY DEFENDANT'S COUNSEL

---

**Susan Prose, United States Magistrate Judge**

    This matter is before the court on the motion of Plaintiff Jefferson Street Holdings, LLC, d/b/a cradl. ltd. ("Jefferson Street") to disqualify Defendant Otter Products, LLC ("Otter")'s counsel of record, Merchant & Gould P.C. ("M&G"). ECF No. 16 (hereafter, the "Motion"). The undersigned magistrate judge considers the motion pursuant to 28 U.S.C. § 636(b)(1)(A) and the order referring the motion. ECF No. 19.

    Jefferson Street asserts that M&G has a conflict of interest with respect to a former client—Elizabeth Incorporated—which is a closely-related entity from whom Jefferson Street asserts it took over the cradl phone case business.[1] Jefferson Street argues that the conflict

---

[1] Jefferson Street uses the term the "cradl phone case business" to mean the business *activity*—designing, making and selling cradl brand phone cases— as opposed to the business *entities* that have conducted those activities or held the related assets and liabilities. Hereafter, the court does likewise, using the defined term: the "cradl Phone Case Business."

requires M&G to be disqualified. Otter opposes the Motion. ECF No. 29 (the "Resp."). Jefferson

Street replied. ECF No. 38 (the "Reply"), No. 39 (Level 1 Restricted exhibits), No. 40 (Level 2

Restricted exhibits, i.e., in camera documents). The court permitted Otter to file a short sur-reply.

ECF No. 47 (the "Sur-Reply"). The court held an evidentiary hearing on November 1, 2023. For

the reasons that follow, the court denies the Motion.[2]

I.    *Relevant Facts and Procedural History*

This is a patent infringement case. The following facts are taken from the Complaint, the

briefing on the Motion, and evidence received at the November 1 hearing.

A.    *The Patents-in-Suit and Related Allegations.*

Jefferson Street owns "U.S. Patent Nos. 11,399,606; 10,820,675; 10,327,524; and

9,480,319 (collectively, the 'Asserted Patents'), [which] generally relate to cases for an

electronic device created by mother-daughter duo Elizabeth Dining and Erin Watt. Additional

inventors named in the Asserted Patents include Zachary Conrad, Cameron Brown, and Jeremy

Kerbs." ECF No. 1, Complt. ¶ 6. These patents are respectively referred to individually as the

**'606 Patent** (ECF No. 1-3, Complt. Ex. A), **'675 Patent** (ECF No. 1-4, Complt. Ex. B), **'524

Patent** (ECF No. 1-5, Complt. Ex. C), and **'319 Patent** (ECF No. 1-6, Complt. Ex. D).

Jefferson Street alleges it owns the Asserted Patents by assignment. Complt. ¶¶ 7-10. It

further alleges that "[t]o develop, manufacture, and distribute these cases, [Ms.] Watt (who was

only 15 years old at the time) and [Ms.] Dining co-founded a company called 'cradl.' in 2014 in

Boulder, Colorado. . . . The purpose of cradl was to create phone cases that were protective and

---

[2] Motions to disqualify counsel are non-dispositive, and therefore the undersigned magistrate
judge issues this ruling as an order. *See, e.g.*, *O'Hanlon v. AccessU2 Mobile Sols., LLC*, No. 18-
cv-00185-RBJ-NYW, 2019 WL 1081079, at *4 (D. Colo. Jan. 22, 2019).

durable while also being sleek and stylish. cradl officially launched . . . on January 6, 2015."
Complt. ¶ 11 (citing https://www.cradlcase.com/about/).

The Asserted Patents are continuations of a parent application, No. 14/632,927, filed on
February 26, 2015, on which Patent No. 9,300,768 was granted. *See, e.g.,* '606 Patent at 3, '675
Patent at 3, '524 Patent at 2 ¶ 63, '319 Patent at 2 ¶ 63 (each noting it is a continuation).[3] The
court refers to the original application as the "Parent Application." In support of the Motion,
Jefferson Street filed a copy of the Parent Application and the patent granted upon it (the '768
Patent). ECF Nos. 16-2, 16-3. The patent granted on the Parent Application is *not* among the
Asserted Patents.

However, each Asserted Patent uses the specification of the Parent Application. *See, e.g.,*
'606 Patent at 22; '675 Patent at 21; '524 Patent at 21; '319 Patent at 21 ("The present
application is a continuation of and claims priority from U.S. patent application Ser. No.
14/632,927, filed Feb. 26, 2015, the entire disclosure of which is hereby incorporated by
reference").

The specification of the Parent Application is quite lengthy and technical, and the court
therefore does not attempt to exhaustively summarize it. For purposes of resolving only this
Motion, suffice it to say that the specification describes inventions of portable electronic device
cases involving combinations of rigid and resilient layers, turned edges of differing heights, and
bridges or gaps on one surface, all of which are intended to protect the electronic devices without
being bulky or obscuring their style, screen and control buttons. ECF No. 16-2 at 2-12. Broadly

---

[3] For simplicity's sake, all page references to documents in the docket are to the page *of the pdf*
as it was filed in ECF, not to the document's native page numbering.

and non-technically speaking, this description is similar to Jefferson Street's description of the Asserted Patents in its Complaint. ECF No. 1, Complt. ¶¶ 7-11 (describing phone cases with various edges of differing heights and openings in panels). The parties hotly debate whether the specification of the Parent Application has any bearing on the claims of the Asserted Patents that Jefferson Street asserts Otter has infringed, or whether the parent's specification otherwise may become relevant.

Jefferson Street brings four counts of patent infringement against Otter, one for each of the Asserted Patents. It alleges Otter has directly infringed "at least" one claim of each Asserted Patent. *See, e.g.,* Complt. ¶ 15 (alleging "at least Claim 11 of the '606 Patent"). Jefferson Street further alleges that Otter has induced others to directly infringe the Asserted Patents (Complt. at 16-17), contributed to direct infringement by end users of the accused Otter products (*id.* at 18), and that its direct and indirect infringement is willful. *Id.* at 19. Jefferson Street seeks damages, permanent injunctive relief, pre- and post-judgment interest, and for the court to declare this an exceptional case and award reasonable attorney's fees and costs pursuant to 35 U.S.C. § 285. *Id.* at 19-20.

For its turn, Otter's current pleading is the amended answer and first amended counterclaims[4] filed on September 13, 2023. ECF No. 48. Otter filed its pleadings subject to a Level One restriction on access because of the pending Motion. Among other things, Otter pleads waiver, acquiescence, and equitable estoppel. *Id.* at 29 (Twelfth Affirmative Defense). It counterclaims for declaratory judgment that the Asserted Patents are invalid. *Id.,* Counts I-IV.

---

[4] The pleading is titled as an answer and "countercomplaint" but properly refers to itself as stating counterclaims. *See* Fed. R. Civ. P. 13.

B.    *M&G Represented Jefferson Street's Related Entity, Elizabeth Incorporated, on the Parent Application.*

As noted, Jefferson Street is not M&G's former client. The Motion explains:

> From April 2014 to December 2015, M&G represented Ms. Dining's company, **Elizabeth Incorporated,** in connection with the cradl phone case business. *See* Ex. 1 [Engagement Letter]. M&G represented Elizabeth Incorporated generally on intellectual property issues, both on trademarks for the "cradl" brand as well as on patent strategy for the cradl phone cases. *See id.*

ECF No. 16 at 5 (emphasis added).

Thus, the former client at issue is Elizabeth Incorporated. That entity is solely owned by Ms. Dining. Ms. Dining testified that she also owns 99 per cent of Jefferson Street.[5] The two entities are thus closely related.

1.    *The M&G-Elizabeth Incorporated Engagement Letter.*

As relevant to this case, M&G and Elizabeth Incorporated entered into a written engagement letter dated April 8, 2014 on a patent matter. ECF No. 16-1 (the "Engagement Letter"). George C. Lewis, P.E., a partner of M&G, addressed the Engagement Letter to "Ms. Elizabeth Dining c/o Elizabeth Incorporated, 3100 Jefferson St., Boulder." Mr. Lewis (on behalf of M&G) and Ms. Dining— as President of Elizabeth Incorporated—signed the Engagement Letter as of its date. *Id.* at 4.[6] The second paragraph of the Engagement Letter provides:

---

[5] The remaining one per cent of Jefferson Street is owned by its chief financial officer.

[6] On behalf of M&G, Mr. Lewis and an associate also signed the same day a "Mutual Non-Disclosure Agreement" with Ms. Dining. ECF No. 16-1 at 8-10. Neither side relies on that agreement here.

> As discussed, **our client in this matter will be Elizabeth Incorporated,** hereafter referred to as the "Company." The Company may have numerous affiliates. You have agreed that our representation of the Company in the matter described below does not give rise to a lawyer-client relationship between our firm and any of the Company's affiliates. Accordingly, representation of the Company in this matter will not give rise to any conflict of interest in the event other clients of the firm are adverse to any of the Company's affiliates.

Engagement Letter at 2 (emphasis added). Hereafter, the court refers to this matter as the "Former Representation."[7]

M&G was "engaged to advise the Company in connection with trademark and intellectual property counseling . . . . Because we are not your general counsel, our acceptance of this engagement does not involve an undertaking to represent you or your interests in any other matter." *Id.*

Several additional paragraphs of the Engagement Letter also address conflicts of interest. M&G noted the potential for law firms, "especially those like ours which engage in a specialty practice and represent many companies and individuals," to have conflicts of interest. The Engagement Letter addresses how the firm would handle such conflicts and what would happen if the firm withdrew. *Id.* at 2-3.

The last paragraph of the Engagement Letter incorporates by reference an attachment entitled "Standard Terms of Representation." *Id.* at 5-7. Those terms include:

> If you affiliate with, acquire, are acquired by, or merge with another company, you agree to provide us with sufficient notice to permit us to withdraw as your lawyer if we determine that such affiliation, acquisition, or merger creates a conflict of interest between any of our clients and the other party to such affiliation, acquisition, or merger, or if we determine that it is not in the best interests of the firm to represent the new entity.

---

[7] Again, Elizabeth Incorporated retained M&G in other engagements, including a trademark matter well after the Former Representation, but no one asserts those engagements are relevant.

*Id.* at 5.

>    2.    *M&G Drafted and Filed the Parent Application, but the Firm Withdrew Before the U.S. Patent and Trademark Office Acted Thereon.*

M&G drafted and filed the Parent Application for Elizabeth Incorporated. Specifically, Jefferson Street asserts that George Lewis and Andrew Jagenow, partners in M&G, handled the Parent Application. *See, e.g.,* ECF No. 16-11 (filing receipt for the Parent Application, filed by Mr. Jagenow on February 26, 2015). Neither Mr. Lewis nor Mr. Jagenow is counsel of record in this case. As will be seen, Otter's counsel of record in this case was not a member of M&G at the time.

A few months later, M&G withdrew from the Former Representation. The parties differ somewhat concerning why and when this occurred. According to Jefferson Street, "[s]oon after filing the parent patent application, M&G declared that it had overlooked a conflict posed by its ongoing representation of Otter Products." ECF No. 16 at 4. In her declaration submitted with Jefferson Street's Reply, Ms. Dining states that M&G "informed [her] that continuing to represent me posed a conflict with another, existing client in the phone-case space. At the time, Merchant & Gould did not inform me who that other client was, but I understand now that it was Otter Products." ECF No. 38-1 (Dining Dec.) ¶ 5.

At the hearing, Ms. Dining testified that after the Parent Application was filed, she saw phone cases for a new Samsung phone. Those new cases included the "high-low" feature (now referred to as "drop-down sides") that was one of the subjects of the Parent Application. She identified those cases in an email chain with Mr. Lewis in August 2015.[8] In response, Mr. Lewis

---

[8] The court has reviewed the email chain in camera. ECF No. 40. This correspondence remains attorney-client privileged except to the extent the privilege is waived in Ms. Dining's declaration

met with Ms. Dining and told her that they had not done as thorough a conflict check as they should have, the patent matter created a conflict, and the firm could not continue on that matter.

According to M&G's general counsel, the firm had not overlooked a conflict of interest. Rather, in August 2015, M&G received a request from Elizabeth Incorporated that, in the firm's view, presented a potential conflict with another current client. ECF No. 29-21 (Brent E. Routman Dec.) ¶ 4.[9] Specifically, "Merchant was requested in August 2015 to undertake an additional scope of advice by Elizabeth Inc., namely, to evaluate a group of products from various manufacturers and analyze those products vis-a-vis the pending patent application filed by Elizabeth Inc." *Id.*

> When conducting the resulting conflict check regarding the named manufacturers, the check revealed that one of the manufacturers was a current trademark and licensing client of the firm. Merchant informed Elizabeth that the proposed project would put Merchant into conflict with another current client, but suggested that the representation could proceed if the potential conflict were to be waived.

*Id.* M&G met with Ms. Dining, as President of Elizabeth Incorporated, and its counsel, Julia Knearl, to discuss the potential conflict and the options for addressing it on August 21, 2015. *Id.* A few days later, Mr. Lewis provided a draft proposed waiver of the conflict to Ms. Knearl. *Id.*

Elizabeth Incorporated did not sign the proposed waiver. On September 21, 2015, Elizabeth Incorporated instead notified M&G to transfer all patent files to Ms. Dining and informed that she had retained new counsel. *Id.* ¶ 5. M&G did so a few days later on September 24, 2015. *Id.* ¶ 6. Thus, M&G's representation of Elizabeth Incorporated in the Former

---

and hearing testimony.

[9] As will be discussed below, when Plaintiff's counsel asserted the conflict, M&G placed an ethical wall around the Former Representation. ECF No. 29-21 ¶ 3. Only its General Counsel has accessed the file since.

Representation ended on September 21, 2015, and the firm took no action on the file or the

Parent Application after that time.[10]

     3.     *Elizabeth Incorporated's New Patent Counsel (Sheridan Ross) Handled the Prosecution of the Parent Application After September 24, 2015.*

On October 27, 2015, the Examiner at the Patent and Trademark Office ("PTO") issued a

non-final rejection of the Parent Application in an "Office Action." ECF No. 29-5 at 4

(document history of Parent Application from patentcenter.uspto.gov). The Office Action

rejected the patent claims that M&G had drafted. Ian Walsworth, a lawyer with Sheridan Ross

P.C., took over the matter on behalf of Elizabeth Incorporated. He requested and conducted a

responsive interview with the Examiner and secured issuance of the '927 Application as U.S.

Patent No. 9,300,768. ECF No. 16-3 ('768 Patent) at item 74 ("Attorney, Agent, or Firm:

Sheridan Ross"); ECF No. 29-6 (Examiner's summary of November 11, 2015 interview, listing

Sheridan Ross as participant); ECF No. 29-7 (January 28, 2016 Comments on Statement of

Reasons for Allowance, at signature). The Examiner noted that Sheridan Ross "proposed claim

amendments to overcome the objection to claims 2-10." ECF No. 29-6.

Mr. Walsworth likewise handled the prosecution of the Asserted Patents. ECF No. 29-8.

C.     *Chronology of Corporate Formations and Transactions.*

Meanwhile, because the parties dispute whether Jefferson Street stands in the shoes of

Elizabeth Incorporated with respect to the Former Representation, additional history concerning

Ms. Dining's entities related to the cradl Phone Case Business is required.

The Motion describes Elizabeth Incorporated as "the predecessor in interest to plaintiff."

---

[10] Again, M&G continued to represent Elizabeth Incorporated on at least trademark matters, but no one argues those matters are relevant.

Motion at 4. Both are "closely held companies owned by Elizabeth Dining, one of the inventors of the patents asserted in this action. She formed Jefferson Street Holdings to spin out her 'cradl' phone case business into a separate corporate entity." *Id.* Ms. Dining decided to do so shortly after obtaining new patent counsel, so the "cradl business" would be in a "separate company dedicated solely to that business." *Id.* at 6. Specifically, the Motion asserts that Ms. Dining "formed Jefferson Street Holdings, LLC d/b/a cradl ltd. *and transferred the cradl business to it*, including the patent application filed by M&G." *Id.* (emphasis added).

In chronological order, the record reflects the following facts relevant to the asserted transfer of the cradl Phone Case Business from the former client of M&G (Elizabeth Incorporated) to Jefferson Street (Plaintiff and the movant).

1.   *In 2013, Ms. Dining Started the cradl Phone Case Business Through Elizabeth Incorporated.*

From 1997 to 2009, Ms. Dining owned and operated an insurance business through Elizabeth Incorporated. ECF No. 38-1 (Dining Dec.) ¶ 3. In 2009, she merged the insurance business into another entity and sold it. She kept Elizabeth Incorporated as an entity she solely owns.

From 2009 until Ms. Dining started the cradl Phone Case Business, Elizabeth Incorporated did not actively conduct business. In 2013, Ms. Dining

> **decided to start a new business developing phone cases. I did so using Elizabeth Incorporated**, which I had maintained after selling my insurance business . . . . At the time, I did not appreciate that I should have formed a separate legal entity for my new phone case business. No one at Merchant & Gould ever advised me that I should do so.

Dining Dec. ¶ 4 (emphasis added). On April 8, 2014, as noted above, Elizabeth Incorporated

retained M&G in the Former Representation in which M&G prepared the Parent Application.

>   2.   *May 13, 2014, Ms. Dining Formed a Limited Liability Company Related to the cradl Phone Case Business for Tax Purposes: cradl. ltd.*

As noted in the caption, Jefferson Street uses "cradl. ltd" as a trade name. However, there is also a separate limited liability company by the same name, "cradl. ltd." ECF No. 29-18 (articles of organization). The articles of organization identify Elizabeth Incorporated as the person forming this limited liability company. *Id.* The company's principal office address was 3100 Jefferson Street in Boulder, which Ms. Dining explained in her declaration was and is her home. *Id.* Ms. Dining testified that her certified public accountant's office formed the "cradl. ltd." company for tax purposes.

The court takes judicial notice that the Colorado Secretary of State's online files show cradl. ltd. is currently in good standing. https://www.sos.state.co.us (summary for entity number 20141301696). *Powell v. Il Vicino Int'l, LLC,* No. 18-cv-01139-RBJ-NYW, 2018 WL 4088072, at *2 (D. Colo. June 14, 2018) (citing *Tal v. Hogan,* 453 F.3d 1244, 1264 n.24 (10th Cir. 2006), noting "[a] court may take judicial notice of facts which are a matter of public record").

>   3.   *January 6, 2015: the cradl Phone Case Business Launches Through Elizabeth Incorporated.*

The Complaint alleges that on January 6, 2015, cradl officially launched at the Consumer Electronics Show ("CES"). Ms. Dining testified that she presented prototypes of the cradl phone cases at the show. At some point prior to CES, Ms. Dining had gone to China and visited with a Chinese manufacturer concerning the manufacture of the phone cases, but she did not yet have actual products to display. Shortly before CES, i.e., in late December 2014 or early January 2015, the cradlcase.com website went live. Ms. Dining testified that Elizabeth Incorporated

owned the website and the prototypes. It also contracted with a vendor, Groundfloor Media, to

assist with the launch at CES. That contract is not in the record.

During 2015, Elizabeth Incorporated pursued the Parent Application and maintained the

cradlcase.com website. In August 2015, as noted above, M&G began to withdraw from the

Former Representation and completed that process by September 2015. Ms. Dining eventually

retained Mr. Walsworth of Sheridan Ross as new patent counsel. Ms. Dining testified that,

during this time, cradl. ltd. was essentially empty and used just for tax purposes.

      *4.*     *December 31, 2015: Ms. Dining Formed Jefferson Street.*

In her declaration, Ms. Dining testified:

> After I hired new [patent] counsel, I learned that the better practice would have
> been to form a new corporate entity for my new phone case business. I formed
> Jefferson Street Holdings LLC for that purpose . . . . I named the entity "Jefferson
> Street Holdings" based on the location of my home, which is on Jefferson Street in
> Boulder, Colorado. For its entire existence, I have owned and controlled Jefferson
> Street Holdings, LLC. Although for limited times Jefferson Street rented a small
> office, I have otherwise run Jefferson Street from my home on Jefferson Street in
> Boulder.

Dining Dec. ¶ 6. Thus, on December 31, 2015, Ms. Knearl filed Jefferson Street's articles of

organization. ECF No. 16-9. The document identifies Ms. Dining as the person forming the

company; the principal office address was Ms. Dining's home.

      *5.*     *August 31, 2016: Elizabeth Inc. Assigned the Patents to cradl. ltd.*

On August 31, 2016, "Elizabeth Inc." assigned the then-pending patent applications (and

the '768 Patent) to "cradl, ltd." ECF No. 16-10 at 1 (filed by Mr. Walsworth on September 1,

2016). The assignment agreement states that "cradl. ltd." is a limited liability company in

Boulder, Colorado. *Id.* at 4.

Meanwhile, "Jefferson Street took orders, received payment, and fulfilled orders for cradl phone cases from the cradl website." Dining Dec. ¶ 7(a). Ms. Dining provides an example from an August 2016 bank statement of Jefferson Street, which she explains

> show[s] revenue for several phone cases ordered in August of 2016. *See* Ex. 14.2 [8/31/16 Bank Statement]. The "TRANSFER X Shopify.com" entries on this statement represent orders for phone cases that were placed through the cradl website and that were fulfilled by Jefferson Street.

*Id.* (citing bank statement in ECF No. 39-1). A few months later, on November 23, 2016, Jefferson Street registered "cradl. Ltd." as a trade name. ECF No. 29-20.

6.    *July 2017, M&G Invoiced Elizabeth Incorporated for a "CRADL" Trademark Matter, which Jefferson Street Paid.*

In July 2017, M&G issued an invoice to Elizabeth Incorporated on a "CRADL mark" matter. ECF No. 39-6 (invoice dated July 1, 2017). Jefferson Street paid the invoice. ECF Nos. 39-6, 39-7, and 39-8. In two of the payments, the company noted in the memo field: "Client 04603 *Elizabeth Inc."* ECF No. 39-6, 39-7 (emphasis added).[11]

7.    *October 26, 2018, the August 2016 Patent Assignment is Corrected Nunc Pro Tunc to Transfer the Patents to Jefferson Street.*

On October 26, 2018, Mr. Walsworth filed a *nunc pro tunc* assignment changing the name of the conveying party from Elizabeth Inc. to Elizabeth Incorporated. *Id.* at 6 (effective the same day as the first assignment, August 31, 2016).[12]

On the same day, Mr. Walsworth also filed a *nunc pro tunc* assignment from cradl. ltd. to

---

[11] The third check likewise identifies the client number for Elizabeth Incorporated, but it does not also name Elizabeth Incorporated. ECF No. 39-8.

[12] Ms. Dining testified that there was an unrelated "Elizabeth Inc." in northern Colorado, thus leading to a potential ambiguity in the original assignment.

Jefferson Street Holdings, LLC, i.e., to Plaintiff. *Id.* at 10. This assignment was effective as of September 1, 2016.

8.    *Additional Assignments of the Asserted Patents.*

Otter points out that on May 30, 2018, an assignment *nunc pro tunc* May 24, 2018, was filed with the PTO for the Asserted Patents. ECF No. 29-15. This document reflects that Cerinet USA, Inc. transferred the patents to Jefferson Street Holdings *Intellectual Property* LLC. Neither of these entities is related to Ms. Dining's entities. A later-filed nunc pro tunc assignment (filed February 26, 2019, retroactively effective back to May 19, 2018), reflects that Jefferson Street had assigned the Asserted Patents to Cerinet USA, Inc. ECF No. 29-14.[13]

Ms. Dining testified that these assignments were for enforcement of the Asserted Patents, and that representatives of Cerinet told her these assignments were necessary for that purpose. Ms. Dining was unsatisfied with these entities' enforcement of the Asserted Patents, and through counsel (Jason Jackson of Kutak Rock) obtained the re-assignment of the patents back to Jefferson Street. ECF No. 29-16 (filed June 24, 2020, *nunc pro tunc* May 28, 2020).

D.    *Otter's Choice of Counsel in this Case.*

Otter's counsel of record in this case, James Beard, has represented or advised Otter in (among other matters) patent litigation since 2010. Resp. at 7; ECF No. 29-2 (Beard Dec.) ¶ 3. He has represented Otter in "offensive and defensive litigations relating to patent, trademark, and copyright interests," including approximately three dozen patent infringement disputes. *Id.* Until 2020, Mr. Beard was with law firms who are not involved in this litigation: Turner Boyd LLP,

---

[13] It appears Cerinet filed these assignments in reverse order, i.e., at the time it filed its assignment to Jefferson Street Intellectual Property, Cerinet did not yet own the patents. It corrected this error in the second document.

and Kirkland & Ellis LLP. He joined the Denver office of M&G in 2020. *Id.* ¶ 4.

Prior to Mr. Beard joining M&G, Heather Kliebenstein (of M&G) began representing Otter in trademark and copyright counseling and litigation at least as early as 2013. Resp. at 7. However, prior to Mr. Beard joining M&G, the firm did not represent Otter in patent litigation matters and has never prosecuted Otter's patents. *Id.*

Jefferson Street does not assert that Mr. Beard personally has a conflict of interest. He apparently has never represented Jefferson Street or any predecessor or affiliate of Jefferson Street.

E.     *The Briefs and the November 1 Hearing.*

As will be seen below, the operative ethical rule (Rule 1.9) has three elements that Jefferson Street must show in order to demonstrate that M&G should be disqualified: (1) a former attorney-client relationship between the movant and opposing counsel; (2) a substantially related matter; and (3) material adversity to the movant/former client.

In the Motion, Jefferson Street largely assumed that it holds Elizabeth Incorporated's former client status or should otherwise be treated as such here. Jefferson Street stated that Elizabeth Incorporated transferred the cradl Phone Case Business to it, but the Motion did not provide a supporting declaration and cited for this point only Jefferson Street's articles of organization and the patent assignments. *See* Motion at 6; ECF Nos. 16-9, 16-10. The Motion focused more heavily on the second and third elements: the substantial relationship of this case to the Parent Application, and the material adversity element.

In response, Otter disputes that Jefferson Street has satisfied any of the three elements. It submits several documents and three declarations. *See* ECF No. 29 and attachments. Specifically,

Otter provides declarations from its counsel of record in this case (Mr. James Beard, ECF No. 29-2 (Beard Dec.)) and its in-house general counsel, Mr. Brent Routman. ECF No. 29-21 (Routman Dec.). Mr. Beard states that he has not accessed the files from the Former Representation; that he has not discussed that matter with Mr. Lewis or Mr. Jagenow (other than to confirm that he had seen the July 13, 2023 correspondence from Jefferson Street's counsel, Mr. Antonelli, asserting the conflict); and that he drafted Otter's pleadings (including its defensive and counterclaim theories) without any knowledge of or from the Former Representation, but instead based on information and materials separately known to him. Beard Dec. ¶¶ 7-9. Mr. Routman details what he has done as M&G's designated general counsel in response to Jefferson Street's assertion of the conflict, including placing an ethical wall around the Former Representation and investigating the facts. Routman Dec. ¶ 3.

Otter also submitted a report from Professor David Hricik of Mercer University School of Law. ECF No. 29-1 ("Hricik Report"). Otter relied on Professor Hricik as an expert in patent law ethics.[14]

Otter argued that Jefferson Street had waived the ability to present any further argument or evidence to support the first element, a former attorney-client relationship between the movant and opposing counsel, since it is inappropriate to raise new issues on reply. Resp. at 20. Otter is correct that usually a movant cannot supply evidence or arguments in a reply that it could have foreseen in its motion. *See, e.g.*, *In re Gold Res. Corp. Sec. Lit.,* 957 F. Supp. 2d 1284, 1291 (D. Colo. 2013) (noting an exception "when the new issue argued in the reply brief is offered in

---

[14] Professor Hricik's report is styled as a declaration, but like many expert reports, it does not declare under penalty of perjury that its contents are true and correct under 28 U.S.C. § 1746.

response to an argument raised" by the other party's brief, citing *Beaudry v. Corrections Corp. of Am.,* 331 F.3d 1164, 1166 n.3 (10th Cir. 2003)). Despite this being an issue that Jefferson Street should have fully addressed in its Motion, it nonetheless added many facts and arguments in its Reply. *See* ECF Nos. 38, 39, 40 and their attachments. The court thus allowed Otter's Sur-Reply, which addressed some of the factual issues raised by the Reply. ECF No. 47.

In part because Otter's Response could not anticipate most of the facts in Jefferson Street's Reply with respect to the former attorney-client relationship issue, and in part because the evidence Jefferson Street submitted with its Reply did not address all of the relevant factual questions, the court deemed a hearing necessary. Thus, on November 1, 2023, the court heard approximately five and a half hours of opening statements, testimony from Ms. Dining (in person), testimony from Professor Hricik (by video), and closing arguments. ECF No. 71 (minutes).

As the docket reflects, the court granted Otter's motion to present Professor Hricik by video over Jefferson Street's objections to his being permitted to testify as an expert and his being permitted to testify remotely. ECF No. 69 (order of October 27, 2023). At the hearing, Jefferson Street renewed its objections to Professor Hricik as an expert. The court, however, found Professor Hricik—a law school professor with many years of experience, study, and teaching on ethical issues arising in patent law and practice—qualified as an expert to testify concerning patent law ethics. For the same reasons the court stated in its October 27, 2023 order, Professor Hricik's testimony concerning patent law ethics was relevant and an appropriate subject for expert testimony on the motion to disqualify. *See, e.g., Schrock v. State Farm Auto. Ins. Co.*, No. 21-cv-01392-PAB-MEH, 2022 WL 4547569, at *5 nn.5-6 (D. Colo. Sept. 29,

2022) (in order granting motion to disqualify attorney, noting that both sides submitted declarations provided by legal ethics experts who opined on whether attorney had a conflict of interest in the case); *see also Palgut v. City of Colo. Springs*, No. 06-cv-01142-WDM-MJW, 2009 WL 539723, at *3 (D. Colo. Mar. 3, 2009) (in accepting recommendation to deny attorney's motion to withdraw, discussing opinion testimony from "an expert in the field of attorney ethics"); *cf. MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 468 F. App'x 816, 828 (10th Cir. 2012) (rejecting argument that testimony by legal ethics expert was inappropriate on claim against lawyer asserting confidentiality rules in defense). The court directed Otter's counsel that Professor Hricik should not testify concerning cases or other law, as it is for the court to determine the law.[15]

II.       *Legal Standards for Motions to Disqualify Counsel*

"As disqualification is a procedural matter not unique to patent law, regional circuit law applies." *Evolutionary Intel., Inc. v. Facebook, Inc.*, No. 6:12CV784, 2013 WL 12140485, at *2 (E.D. Tex. July 3, 2013) (citing *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 580-81 (Fed. Cir. 1989) (because "[q]uestions dealing with the provisions of the Model Code of Professional Responsibility involve procedural matters which are not unique to patent cases," regional law applies).

"A motion to disqualify rests with the sound discretion of the trial court." *O'Hanlon v. AccessU2 Mobile Sols., LLC*, No. 18-cv-00185-RBJ-NYW, 2018 WL 3586395, at *3 (D. Colo. July 26, 2018), *report and recommendation adopted*, 2019 WL 1081079 (D. Colo. Jan. 22,

---

[15] To the extent Professor Hricik nonetheless testified concerning cases the law, the court did not rely on that testimony. As will be seen below, the court has undertaken its own analysis of the applicable law.

2019). The Motion is "governed by two sources of authority. First, attorneys are bound by the local rules of the court in which they appear. Federal district courts usually adopt the Rules of Professional Conduct of the states where they are situated. Second, because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law." *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1383 (10th Cir. 1994); *see also United States v. Stiger,* 413 F.3d 1185, 1195 (10th Cir. 2005).

"Therefore, motions to disqualify are governed by the ethical rules announced by the national profession and considered in light of the public interest and the litigants' rights." *Cole*, 43 F.3d at 1383*.* (internal quotation marks omitted). The American Bar Association's Model Rules of Professional Conduct "reflect the national standard to be used in ruling on disqualification motions." *Id.* With exceptions not pertinent here, this District has adopted the Colorado Rules of Professional Conduct. D.C.COLO.LAttyR 2(a). However, "'a violation of a disciplinary rule does not automatically result in disqualification; rather a court must determine whether the litigation can be conducted with fairness to all parties or whether the misconduct taints the trial or legal system in some way.'" *Schrock*, 2022 WL 4547569, at *2 (quoting *Carbajal v. Am. Fam. Ins. Co.*, No. 06-cv-00608-PSF-MEH, 2006 WL 2988955, at *1 (D. Colo. Oct. 18, 2006); citing *FDIC v. Isham*, 782 F. Supp. 524, 528 (D. Colo. 1992)).

The moving party "bears the burden of establishing the grounds for disqualification." *Banks v. Jackson*, No. 20-cv-02074-NYW, 2022 WL 1451904, at *9 (D. Colo. May 9, 2022) (citing *Quark, Inc. v. Power Up Software Corp.*, 812 F. Supp. 178, 179 (D. Colo. 1992), and *FDIC v. Sierra Res., Inc.*, 682 F. Supp. 1167, 1170 (D. Colo. 1987)); *see also Religious Tech.*

*Ctr. v. F.A.C.T. Net, Inc.*, 945 F. Supp. 1470, 1473 (D. Colo. 1996) (holding same). "Specific facts must be alleged and counsel cannot be disqualified on the basis of speculation or conjecture." *Banks*, 2022 WL 1451904, at *9 (citing *Quark* and *Sierra Res.*). "In ruling on the [M]otion, [the undersigned] must make factual findings, but the use of those findings is limited solely to the motion to disqualify." *BlueRadios, Inc. v. Kopin Corp., Inc.*, No. 16-cv-2052-JLK, 2017 WL 11546716, at *1 (D. Colo. Jan. 24, 2017) (internal citation omitted, citing *Religious Technology*, 945 F. Supp. at 1473).

"Motions to disqualify opposing counsel are generally disfavored. Indeed, courts have historically been highly cynical of motions to disqualify opposing counsel, noting that such motions are often dilatory or tactical devices." *Banks*, 2022 WL 1451904, at *9 (internal citations and quotation marks omitted, citing *inter alia Cope v. Auto-Owners Ins. Co.*, 437 F. Supp. 3d 890, 906 n.14 (D. Colo. 2020)). Accordingly, "disqualification of a party's chosen attorney is an extreme remedy and should not be granted without ruling out reasonable remedies short of disqualification." *Cope*, 437 F. Supp. 3d at 906 n.14 (internal quotation marks omitted, agreeing with *In re Estate of Myers,* 130 P.3d 1023, 1027 (Colo. 2006)). "While the power to disqualify an attorney from a case 'is one which ought to be exercised with great caution,' it is 'incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession.'" *Schrock*, 2022 WL 4547569, at *15 (citing *inter alia United States v. Collins*, 920 F.2d 619, 634 (10th Cir. 1990)).

III.     *Analysis*

Jefferson Street argues M&G has a former client conflict under Rule 1.9, the first element of which is an attorney-client relationship. Jefferson Street presents two alternative theories for

why it should be considered a former client: first, it argues Elizabeth Incorporated transferred the complete cradl Phone Case Business to it, and second, the close relationship between the two entities supports treating them as the same entity under the "corporate affiliate conflicts doctrine." But for the reasons explained below, the transfer-of-business theory fails on the facts (particularly as disclosed at the hearing), and the close-affiliation theory fails because it contradicts the express terms of the Engagement Letter.

A.     *The Elements of Rule 1.9: Duties to Former Clients.*

Colorado has adopted the ABA Model Rule of Professional Conduct 1.9 to define conflicts of interest with former clients. It provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

Colo. R. Prof. Conduct 1.9(a); ABA Model Rule of Prof. Conduct 1.9(a). Colorado also has adopted Model Rule 1.13, which provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Hence, "the corporation . . . is the client," and the "attorney-client privilege belongs to" the corporation. *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 463 (Colo. App. 2003).

In applying Rule 1.9, the Tenth Circuit has thus held:

> A party seeking to disqualify opposing counsel on the ground of a former representation must establish that:
> (1) an actual attorney-client relationship existed between the moving party and the opposing counsel;
> (2) the present litigation involves a matter that is "substantially related" to the subject of the movant's prior representation; and
> (3) the interests of the opposing counsel's present client are materially adverse to

the movant.

*Cole,* 43 F.3d at 1384 (citing *inter alia English Feedlot, Inc. v. Norden Labs., Inc.,* 833 F. Supp. 1498, 1506 (D. Colo. 1993); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 855 F. Supp. 330 (D. Colo. 1994)).

"The threshold question for the court is whether there was an attorney-client relationship that would subject a lawyer to the ethical obligation of preserving confidential communications. For there to have been an attorney-client relationship, the parties need not have executed a formal contract. Nor is the existence of a relationship dependent upon the payment of fees. However, a party must show that (1) it submitted confidential information to a lawyer and (2) it did so with the reasonable belief that the lawyer was acting as the party's attorney." *Cole*, 43 F.3d at 1384 (internal citations omitted). However, "the party moving for disqualification need not reveal the substance of its communication to the lawyer and [u]sually, a showing of the circumstances and subject of the consultation will be enough to demonstrate whether the information was confidential." *Stiger*, 413 F.3d at 1196 (internal quotation marks omitted, quoting *Cole*, 43 F.3d at 1384 n.8).

B.   *The First Element: Does Jefferson Street Stand in Elizabeth Incorporated's Shoes in its Former Attorney-Client Relationship with M&G?*

In this case, it is clear that Elizabeth Incorporated had an attorney-client relationship with M&G and thus is a former client within the meaning of Rule 1.9. But Elizabeth Incorporated is not involved in this case, and thus the key question for this element is: does Jefferson Street stand in the shoes of Elizabeth Incorporated with respect to M&G? The parties dispute what type of business transfer would suffice for that purpose, and whether the Engagement Letter's provisions concerning affiliates preclude Jefferson Street from being considered a former client.

However, two guideposts are clear.

First, Elizabeth Incorporated's assignment of the patents to Jefferson Street does not suffice to make the latter a former client of M&G, even though M&G filed the Parent Application. "[T]he assignment of a patent does not transfer an attorney client relationship." *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336 (Fed. Cir. 1988) (citing *inter alia SMI Indus. Canada Ltd. v. Caelter Indus., Inc.*, 586 F. Supp. 808, 815 (S.D.N.Y. 1984)); *see also In re Yarn Processing Patent Validity Lit.*, 530 F.2d 83, 90 (5th Cir. 1976) ("Assignment of the patent does not assign [the lawyer] along with it."); *cf. In re Las Uvas Valley Dairies*, 648 B.R. 260, 265 (Bankr. D.N.M. 2022), *recon. denied*, 649 B.R. 53 (Bankr. D.N.M. 2023) ("While the case law apparently treats the attorney-client privilege as an assignable right or asset, . . . the attorney-client *relationship* is not assignable and was not assigned in this instance," when the "[d]ebtor's assets were transferred to a liquidating trust and [d]ebtor went out of business.") (emphasis in original); *Fed. Deposit Ins. Corp. v. McAtee*, 124 F.R.D. 662, 664 (D. Kan. 1988) ("The transfer of assets from one entity to another does not generally transfer the attorney-client privilege," citing *Telectronics* and *Yarn Processing*). Jefferson Street does not appear to contest this point of law.

Second, Ms. Dining's common ownership of Elizabeth Incorporated and Jefferson Street does not suffice in itself to make Jefferson Street a former client of M&G. "[C]ourts have held that 'representation adverse to a former client's affiliate is *proper* unless there is a high degree of operational commonality and financial dependence between the affiliated entities.'" *Evolutionary Intel.*, 2013 WL 12140485, at *14 (emphasis added, quoting *GSI Com. Sols., Inc. v. BabyCenter LLC*, 618 F.3d 204, 210-11 (2d Cir. 2010)). This is commonly referred to as the "corporate

affiliate conflicts" doctrine, which the court addresses below in light of the Engagement Letter's exclusion of affiliates.

Beyond these two guideposts, "[t]here is no bright-line rule regarding whether the attorney-client relationship is transferred upon corporate restructuring." *Id.* at *13 (citing *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760 (E.D. Tex. 2004)). To assess the question, courts look beyond the nominal title of the transaction—e.g., merger, acquisition, asset transfer, assumption in bankruptcy—to its "practical consequences": "'If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management,' the attorney-client relationship will follow as well." *The Hillman Grp., Inc. v. KeyMe, LLC*, 439 F. Supp. 3d 845, 853-54 (E.D. Tex. 2020) (quoting *John Crane Prod. Solutions, Inc.*, No. 3:11-CV-3237-D, 2012 WL 3453696, at *3 (N.D. Tex. Aug. 14, 2012)) (additional citations omitted); *see also Commodity Futures Trading Commn. v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well."). At least two sister courts within the Tenth Circuit have applied the "practical consequences" test. *See Applied Asphalt Tech's v. Sam B. Corp.,* No. 2:14-cv-00800-JNP-DBP, 2016 WL 427070, at *5 (D. Utah Feb. 3, 2016) (citing *Soverain*, 340 F. Supp. 2d at 764, and applying this test in the context of a prospective client conflict); *Kinzer v. Remington Arms Co., Inc.,* No. Civ-09-1242-R, 2010 WL 11451120, at *3 (W.D. Okla. May 10, 2010) (applying the test under Okla. Rule of Prof. Conduct 1.9(a), citing *Soverain*, 340 F. Supp. 2d at 763, and *Tekni-Plex v. Meyner & Landis,* 89 N.Y.2d 123, 133 (N.Y. App. 1996)); *see also Parus Holdings, Inc. v. Banner & Witcoff, Ltd.,* 585 F. Supp. 2d 995, 1002 (N.D. Ill. 2008) (recognizing that "the

better reasoned rule, and the one that appears to be followed by the majority of recent cases, is the general ['practical consequences'] standard").

"In looking at the 'practical consequences' of a transaction, some courts have looked specifically at factors such 'as the extent of the assets acquired, including whether stock was sold, whether the purchasing entity continues to sell the same product or service, whether the old customers and employees are retained, and whether the same patents and trademarks are used." *Hillman Group*, 439 F. Supp. 3d at 854 (quoting *John Crane*, 2012 WL 3453696, at *3). Professor Hricik, who testified at the hearing, emphasized that the question of whether a third party should be treated like a former client for purposes of disqualification "turns on the particular facts," and that "[i]f the third party essentially acquires control of the assets and operations of the former client, it may have standing to move for disqualification."[16] *Patent Ethics: Litigation* (2016-2017 Ed.), Hrg. Ex. 2 at 2 (note omitted); *id.* at 3 (stating that "[t]he analytical focus is on whether control of the predecessor organization passed to the successor organization").

With these standards in mind, the court turns to the parties' arguments on the first element.

1.    *Elizabeth Incorporated Did Not Transfer the Entire cradl Phone Case Business and Thus Did Not Transfer the Attorney-Client Relationship to Jefferson Street.*

Jefferson Street first argues that, regardless of the informal nature of the transfer between

---

[16] At times, the parties refer to Jefferson Street's "standing" to raise the asserted conflict of interest. This is not an issue of standing in the sense of Article III power to hear the dispute, but rather whether Jefferson Street is the appropriate person to raise the issue. *See, e.g.*, *Applied Asphalt*, 2016 WL 427070, at *2. The court has inherent power to disqualify attorneys in cases before it. *Id.* (citing *Weeks v. Indep. Sch. Dist. No. I-89*, 230 F.3d 1201, 1208 (10th Cir. 2000)).

Elizabeth Incorporated and Jefferson Street, the practical consequences are that Jefferson Street alone has been conducting the cradl Phone Case Business since 2016 and that this suffices to transfer the attorney-client relationship. At the hearing, Jefferson Street modified this argument somewhat, recognizing that Elizabeth Incorporated did *not* transfer the cradl trademarks[17] and likely also did *not* transfer the domain name registration for the cradlcase.com website. Nevertheless, according to Jefferson Street, its paying the bills associated with those assets demonstrates the practical consequence of its dealings with Elizabeth Incorporated, i.e., that it received all or substantially all of the business of that entity.

For its part, Otter argues that the mere transfer of business activities is not enough to transfer the attorney-client relationship, but that there must also be a "*transfer of control*." Here, Otter says, Elizabeth Incorporated's continued corporate existence shows there was no such transfer. Further, Otter argues, even accepting Jefferson Street's view that there need be only a transfer of the business activity (and not transfer of full control), the facts show that Elizabeth Incorporated did not transfer its entire business activity to Jefferson Street because it did not transfer the trademarks and the domain registration.

For purposes of resolving the disqualification question, the court need not resolve whether a transfer of control of the former client is strictly necessary. Even under Jefferson Street's less-rigorous view of the legal standard, the court finds that Jefferson Street failed to meet its burden to show the attorney-client relationship with M&G transferred to it. The problem for Jefferson Street is that it has failed to present evidence sufficient to allow the court to find

---

[17] The record does not make plain whether cradl has only one trademark or more than one. In the Motion, Jefferson Street refers to cradl trademarks, plural. The court therefore does likewise.

that Elizabeth Incorporated in fact transferred its entire cradl Phone Case Business to Jefferson Street. Although Ms. Dining may have *intended* to cause Elizabeth Incorporated to transfer the entire cradl Phone Case Business to Jefferson Street, that is not what happened.

The only evidence in the record demonstrating that Elizabeth Incorporated actually *transferred* anything to Jefferson Street is (1) the patent assignments (which as noted above, are not enough standing alone) and (2) Ms. Dining's testimony that she transferred the cradl Phone Case Business to Jefferson Street. Ms. Dining states that she "did not merely assign the patents at issue . . . to Jefferson Street," but that she "transferred the cradl phone case business to it, which is the reason [she] formed it." Dining Dec. ¶ 7. But Ms. Dining does not elaborate on *how* or when she did so—for example, she presents no documentation of a merger, transfer, assignment, or sale of the business to Jefferson Street.

On cross-examination, Ms. Dining recognized that the cradl trademarks remain in Elizabeth Incorporated; she acknowledged that she had forgotten to transfer them. Yet, Otter introduced an exhibit showing that as recently as September 2021, Ms. Dining signed a filing with the Trademark Office for *Elizabeth Incorporated* concerning a cradl mark. Hrg. Ex. 1. Neither did Ms. Dining establish that ownership of the domain name registration for cradlcase.com was transferred to Jefferson Street. Here, too, Jefferson Street presented no documentation of such a transfer. Ms. Dining testified that she simply started using Jefferson Street to conduct the cradl Phone Case Business after January 1, 2016.

Jefferson Street argues that the entire business was transferred to it because, since mid-2016, it has paid all of the expenses associated with the business, including expenses associated with the trademarks and website. Ms. Dining testified that although she keeps Elizabeth

Incorporated in good standing, that entity does not conduct any active business. It does not pay any of the expenses or receive any revenues from the cradl Phone Case Business. She attached to her declaration several documents reflecting that Jefferson Street has in fact conducted the cradl Phone Case Business since August 2016—including employing individuals, subleasing an office space, receiving revenues from Shopify, paying sales tax, taking out an enterprise loan, and fulfilling a giving pledge.

But Jefferson Street's payment of expenses, receipt of revenues, and use of the trademarks and website do not equate to ownership of the underlying assets. As to the trademarks (and likely the domain name registration), their use by Jefferson Street suggests, at most, that it has an implied license from Elizabeth Incorporated. *See, e.g.*, 3 *McCarthy on Trademarks and Unfair Competition* § 18:43.50 (5th ed.) ("A trademark license can sometimes be implied from the conduct of the parties."). And as to the other assets (or liabilities) used in the cradl Phone Case Business, none of the documents attached to Ms. Dining's declaration show that Jefferson Street took over any asset (other than the patents) or liability of Elizabeth Incorporated.[18] Jefferson Street certainly has conducted the business activities since August

_____

[18] Ms. Dining states "several examples show that she transferred the cradl business to Jefferson Street." Dining Dec. ¶ 7(a)-(i) (cleaned up). Those examples show that Jefferson Street was conducting the cradl Phone Case Business by mid-2016 (other than as to ownership of the trademarks and domain name registration), but the documents Ms. Dining submitted do not reflect that Jefferson Street took over any assets or liabilities from Elizabeth Incorporated. For example:

> Jefferson Street leased office space for the purpose of the cradl phone business. I am attaching a letter agreement for a small office that was sub-leased by Jefferson Street (for $500 per month) from October 2016 to June 30, 2017. *See* Ex. 14.4 [JSH Lease]. I am also attaching an example of a rent payment made by check by Jefferson Street. *See* Ex. 14.9 [1/9/17 Check].

2016, but the key assets have remained divided among the two entities.

In essence, Jefferson Street asks this court, for purposes of the Motion to Disqualify, to ignore its corporate form and consider it the same entity as Elizabeth Incorporated. Jefferson Street points to no cases taking such an approach in similar circumstances, and the court declines to disregard the legally-binding corporate form here—which, notably, has the effect of protecting Ms. Dining. *See, e.g.*, *In re Phillips*, 139 P.3d 639, 643 (Colo. 2006) (under Colorado law, "[g]enerally, a duly formed corporation is treated as a separate legal entity, unique from its officers, directors, and shareholders"); Colo. Rev. Stat. § 7-80-107(1) (applying case law concerning corporate veil piercing "[i]n any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company").

More specifically, it appears that what Jefferson Street effectively requests—without explicitly saying so and without attempting to meet the legal standard—would amount to "horizontal veil piercing:"

> [H]orizontal veil piercing between sister entities may occur only if (1) the entities share a parent or common owners in the ownership chain and (2) the veils separating each entity from the parent or common owners are first pierced to find that each sister entity is the alter ego of its owners.

*Dill v. Rembrandt Grp., Inc.*, 474 P.3d 176, 185 (Colo. App. 2020). To succeed on this theory, Jefferson Street would be compelled to argue that both Jefferson Street and Elizabeth Incorporated are alter egos of Ms. Dining. But the alter-ego doctrine only applies in favor of a

---

*Id.* ¶ 7(c). However, neither the lease nor the cancelled check reflects that Jefferson Street took over a lease or subleased from Elizabeth Incorporated. ECF No. 38-5 (Ex. 14.4). The documents are silent concerning the identity of the primary lessee.

party who shows injury from the corporate form being used for fraud or otherwise to defeat a rightful claim. *Id*. at 187. Unsurprisingly, then, Jefferson Street does not make an alter ego argument—nor would this court countenance the idea of ignoring the corporate veil only to the extent that it would *benefit* Jefferson Street, the effective outcome were the court to adopt this approach. As Otter points out, Ms. Dining is attempting to reap the benefits of the corporate form (for instance, tax benefits from cradl. ltd.) while avoiding its responsibilities (having to treat Elizabeth Incorporated and Jefferson Street as separate legal entities).The court rejects this impermissible cherry-picking among the benefits and obligations of the corporate form.

The court also cannot ignore the ongoing, parallel existence of the third, separate entity related to the cradl Phone Case Business: cradl. ltd. Ms. Dining testified that she formed this entity for tax purposes when she was starting the cradl Phone Case Business. Although her testimony was credible that she intended to use that entity only for tax purposes, Ms. Dining did not testify that the tax purposes were unrelated to the cradl Phone Case Business. Given the timing, the name of the entity, and Ms. Dining's testimony concerning the company, it would be difficult to see how the tax purposes could legitimately *not* relate to the cradl Phone Case Business.

More importantly, the record reflects that Elizabeth Incorporated first assigned the Asserted Patents to cradl. ltd. At the hearing, Jefferson Street's counsel argued that the assignment to cradl. ltd. was simply a mistake. But the **'524 Patent** also identifies its applicant as "cradl, ltd.," *see* ECF No. 1-5 at 2 (¶ 71, application filed October 12, 2016), and the **'319 Patent** identifies "cradl, ltd." as its assignee (from Elizabeth Incorporated). *See* ECF No. 1-6 at 2 (¶¶ 71, 73, application filed February 12, 2016, patent issued November 1, 2016). These documents show

that if it was a mistake to use cradl. ltd. in the patent assignment and prosecutions, that mistake occurred by at least October 2016 and no action was taken to correct the error until two years later—when the *nunc pro tunc* assignment was filed in October 2018.

Finally, whether transfer of control is necessary or only one factor in the mix, the court finds it significant that Jefferson Street does not argue that it has *any* control over Elizabeth Incorporated. Elizabeth Incorporated remains a separate entity owned by Ms. Dining and that is in good standing with the Colorado Secretary of State. *See* ECF No. 38-2 (as of September 2, 2023); *see also* https://www.sos.state.co.us (last visited November 11, 2023). This too undermines Jefferson Street's assertion that it received Elizabeth Incorporated's former client relationship with M&G. *See Applied Asphalt*, 2016 WL 427070, at *5 (where corporate plaintiff claimed to have "received all of [another entity's] business," but that entity "continued to exist following its sale and assignment" of a patent ultimately obtained by the plaintiff, the plaintiff did not obtain the other entity's attorney-client privilege).[19]

In short, the factual record developed at the hearing shows that Jefferson Street has not

_____

[19] The court found that the continued existence of the entity ("NBMI")—even though "its activities have been limited"—"undermined plaintiff's attempt to show that it had "received all of NBMI's business":

> This statement suggests that NBMI continued to exist after the assignment and may exist to this day. It is somewhat incongruous to claim that the "practical effect" of the transactions here "transfer[ed] control of [NBMI] and the continuation of [NBMI] under new management" as required by the rule Plaintiff attempts to invoke. *See Soverain*[, 340 F. Supp. 2d] at 763. Plaintiff instead appears to suggest that NBMI lacks any other <u>profitable</u> operations. Plaintiff has not cited any authority that indicates NBMI's profitability is dispositive. Thus, Plaintiff did not obtain NBMI's attorney-client privilege.

*Applied Asphalt*, 2016 WL 427070, at *5 (emphasis in original).

received the cradl Phone Case Business "substantially intact." *See STV Asia Ltd. v. PRN Corp.*, No. C-06-1664 JCS, 2006 WL 8460110 (N.D. Cal. June 22, 2006) (concluding that the attorney-client relationship did not transfer, despite the transfer of three patents and "two key players" to the second corporation, where "there was no merger or agreement transferring ownership" of the first corporation to the second). The court therefore finds that Elizabeth Incorporated did not transfer its former relationship with M&G to Jefferson Street.

2.      *Assuming the Corporate Affiliate Conflicts Doctrine Otherwise Applies, the Engagement Letter Overrides it Here.*

a.      *The "Corporate Affiliate Conflicts" Doctrine.*

The court therefore turns to Jefferson Street's second theory on the first element, the "corporate affiliate conflicts" doctrine discussed briefly above. In the Motion and Reply, Jefferson Street relied on cases that apply this doctrine. It also recognized that the Engagement Letter has a provision that purports to expressly exclude affiliates from being considered clients for conflict purposes. In its Reply, Jefferson Street argued that provision is unclear or unenforceable because Jefferson Street did not yet exist at the time, and the letter does not specify "present or future" affiliates.

At the hearing, Jefferson Street took a different course and argued that because the Engagement Letter does not define "affiliates," it is unclear whether Jefferson Street is even an "affiliate" of Elizabeth Incorporated at all. In light of that argument, it is perhaps unsurprising that Jefferson Street did not argue the "corporate affiliate conflicts" doctrine at the hearing. Jefferson Street also argued at the hearing that, in any case, the Engagement Letter's exclusion of affiliates is an advance waiver and as such required Elizabeth Incorporated's informed consent. It argued there was no informed consent because (a) Ms. Dining testified that M&G did not explain

any part of the Engagement Letter to her, and (b) she further testified that she did not understand

that if she transferred the cradl Phone Case Business to an affiliate, that would waive the

protections of a former client.

Since the court rejects Jefferson Street's first factual theory (that it received the entire

business activity), and Jefferson Street did not formally withdraw its corporate affiliate conflict

argument, the court now considers that argument.

As noted above, the corporate affiliate conflicts doctrine requires the movant to show not

just an affiliation, but that "there is a high degree of operational commonality and financial

dependence between the affiliated entities.'" *Evolutionary Intel.*, 2013 WL 12140485, at *14. It

does not appear that the Tenth Circuit has addressed the doctrine, but at least two other circuits

have. *See, e.g., GSI Com.,* 618 F.3d at 210-11 (an opinion of the Second Circuit); *Trimble Inc. v.

PerDiemCo LLC*, 802 F. App'x 556, 559 (Fed. Cir. 2020); *Dr. Falk Pharma GmbH v. GeneriCo,

LLC*, 916 F.3d 975, 985 (Fed. Cir. 2019).

Lower courts in several circuits have likewise applied the corporate affiliate conflicts

doctrine. *See, e.g., Atl. Specialty Ins. Co. v. Premera Blue Cross*, No. C15-1927-TSZ, 2016 WL

1615430, at *10 (W.D. Wash. Apr. 22, 2016); *Honeywell Intern. Inc. v. Philips Lumileds

Lighting Co.*, No. 2:07-cv-463-CE, 2009 WL 256831, *2 (E.D. Tex. January 6, 2009). In

addition, at least two lower courts have discussed the doctrine, but ultimately did not apply it.

*See, e.g., Keefe Commissary Network, LLC, v. Beazley Ins. Co., Inc.*, No. 4:20-cv-00176-SNLJ,

2020 WL 4673782, at *4–5 (E.D. Mo. Aug. 12, 2020) (holding that regardless of whether the

court would adopt the doctrine, engagement letter's exclusion of affiliates governed); *Hartford

Steam Boiler Inspection & Ins. Co. v. Campbell*, No. 4:20-cv-00117-SEB-DML, 2020 WL

7395529, at *9 (S.D. Ind. Dec. 16, 2020) (finding no clear error in magistrate judge declining to apply the doctrine, due to the lack of "a single case from a federal or state court in Indiana adopting or applying" the doctrine). The precise wording of the doctrine varies, as courts have developed the doctrine largely without detailed guidance from professional rules. And as discussed in further detail below, the doctrine does not apply when—as here—an engagement letter precludes considering the affiliate as a client for conflict purposes.

Setting aside the Engagement Letter for the moment, the court assumes without deciding that the corporate affiliate conflicts doctrine applies, and that Jefferson Street has shown the existence of a high degree of operational overlap and financial dependence between itself and Elizabeth Incorporated. The court therefore proceeds to address whether the Engagement Letter's express exclusion of affiliates bars Jefferson Street from receiving the M&G relationship under the corporate affiliate conflicts doctrine.

  b. *The Engagement Letter's Exclusion of Affiliates Bars Treating Jefferson Street as a Former Client.*

As noted previously, the Engagement Letter with Elizabeth Incorporated provides in relevant part:

> As discussed, our client in this matter will be Elizabeth Incorporated, hereafter referred to as the "Company." The Company may have numerous affiliates. **You have agreed that our representation of the Company in the matter described below does not give rise to a lawyer-client relationship between our firm and any of the Company's affiliates.** Accordingly, representation of the Company in this matter will not give rise to any conflict of interest in the event other clients of the firm are adverse to any of the Company's affiliates.

Engagement Letter at 1 (emphasis added).

Neither the Model Rules nor the Colorado Rules of Professional Conduct provide much guidance for when an engagement letter's exclusion of affiliates from the client relationship should be enforced. A comment to Model Rule 1.7 (*current* client conflicts) only makes clear that

> [a] lawyer who represents a corporation or other organization does not, by virtue of that representation, necessarily represent any . . . affiliated organization, such as a parent or subsidiary. See Rule 1.13(a) [the organization as client]. Thus, the lawyer for an organization is not barred from accepting representation adverse to an affiliate . . . unless the circumstances are such that the affiliate should also be considered a client of the lawyer.

Model Rule of Prof. Cond. 1.7, cmt. 34 (in relevant part). This comment follows from an ABA ethics opinion*,* which provides:

> A lawyer who represents a corporate client is not by that fact alone necessarily barred from a representation that is adverse to a corporate affiliate of that client . . . . However, a lawyer may not accept such a representation without consent of the corporate client if the circumstances are such that the affiliate should also be considered a client of the lawyer[.]

ABA Comm'n on Ethics and Prof. Responsibility, Formal Op. 95-390, *Conflicts of Interest in the Corporate Family Context* (Jan. 25, 1995), first paragraph. However, Ethics Opinion 95-390 primarily addresses the situation in which an engagement letter does not clearly define how affiliates will be handled for conflict purposes:

> Clearly, the best solution to the problems that may arise by reason of clients' corporate affiliations is to have a clear understanding between lawyer and client, at the very start of the representation, as to which entity or entities in the corporate family are to be the lawyer's clients, or are to be so treated for conflicts purposes. **This Opinion is principally addressed to those circumstances where there are not such clear governing terms to the engagement**.

*Id.,* sixth paragraph (emphasis added). Since Ethics Opinion 95-390 is "principally addressed" only to situations in which the engagement letter is not clear how corporate affiliate conflicts will be handled, the opinion indicates that when the engagement letter is clear on that issue, it is governed solely by the terms of the engagement letter. *See, e.g., Keefe Commissary*, 2020 WL 4673782, at *5 (noting the court "need not weigh in on the applicability of the corporate affiliate conflicts doctrine because the parties' contract controls under the Model Rules").

But neither Ethics Opinions 95-390 nor any ethical rule of which the court is aware addresses whether an engagement letter's exclusion of affiliates should be considered a mere "client identification" subject only to contractual principles (and thus enforced as the parties' intend unless ambiguous), or if it is instead an "advance waiver" of a conflict or a limit on the scope of representation—either of which would be subject to contractual principles, but would also require the client's informed consent under Rule 1.7 and Rule 1.2, respectively. Courts have taken a variety of approaches in this regard, with no clear majority position.

Otter likewise appears undecided on this question. It refers to the affiliates exclusion as a "disclaime[r]" of "any lawyer-client relationship between Merchant and any other affiliated entity," an "express limit on representation" and a "knowing waiver." Resp. at 22-23. Otter cites *Keefe Commissary's* discussion of a similar exclusion of affiliates as a "representational disclaimer." *Id.* at 22 (citing *Keefe Commissary,* 2020 WL 4673782, at *6).[20] And on cross-

---

[20] In *Keefe Commissary,* the court looked to a comment to Model Rule 1.2 which states: "[t]he scope of services to be provided by a lawyer may be limited by agreement with the client or by the terms under which the lawyer's services are made available to the client." Model Rule of Prof. Conduct 1.2, cmt. 6. *Keefe Commissary*, 2020 WL 4673782 at *5. Rule 1.2(c) requires informed consent for a lawyer to limit the scope of the representation. Nonetheless, *Keefe Commissary* did not require a showing of informed consent. *Id.* at *5-6.

36

examination, Professor Hricik opined that the Engagement Letter's exclusion of affiliates is merely an agreement on client identity and is neither a waiver nor a "prospective consent" to a conflict, the latter of which he discusses in his treatise, *Patent Ethics: Litigation* § 3.07[3][a], as requiring informed consent.[21] *See* Hearing Ex. 2 at 4. But several cases discuss similar provisions as advance conflict waivers. *See, e.g.*, *24-7 Bright Star Healthcare, LLC v. Res-Care, Inc.*, No. 1:21-CV-04609, 2022 WL 1432439, at *5–6 (N.D. Ill. Mar. 24, 2022); *Lennar Mare Island, LLC v. Steadfast Ins. Co.,* 105 F. Supp. 3d 1100, 1114 (E.D. Cal. 2015) (citing Ass'n of the Bar of the City of N.Y. on Prof'l and J. Ethics, Formal Opinion 2007-3).

The Model Rules (and the Colorado Rules of Professional Conduct) *assume* an attorney-client relationship—whether former, current or prospective, there must be a client in order for the rules to apply. Rule 1.9 for instance only applies to "[a] lawyer who has formerly represented a *client*." Model Rule 1.7 similarly only applies to "a lawyer … represent[ing] a *client* if the representation involves a concurrent conflict of interest." The Model Rules do not address how to determine who is and is not a client. "[F]or purposes of determining the lawyer's . . . responsibility, *principles of substantive law external to these Rules determine whether a client-lawyer relationship exists*." Model Rules of Prof. Cond. Preamble and Scope (emphasis added).

Thus, the Model Rules do not address what standards should apply for lawyers to identify their clients in the corporate context. *See, e.g.,* Model Rule 1.0, cmt. 3 (noting "[t]here can be uncertainty . . . as to the identity of the client" for "the law department of an organization," and making no attempt to address that question); *cf.* Model Rule 1.13, cmt. 9 ("Defining precisely the identity of the client and prescribing the resulting obligations of such lawyers [in a governmental

---

[21] This testimony occurred at approximately 2:04 p.m. and 2:20 p.m.

organization] . . . is a matter beyond the scope of these Rules."). The same is true of the Colorado Rules of Professional Conduct.

Since Rules 1.7, 1.2, and 1.9 each *assume* an attorney-client relationship, it is not clear that any of these rules apply to an engagement letter's definition of the client, or more specifically, to an exclusion of affiliates from the representation. Logically, engagement letter terms that define the client take precedence over all of these rules and therefore remove the subject from the rules' purview. That is, an agreement that excludes affiliates from being clients at the outset overrides the application of any ethical rules (and the corporate affiliate conflicts doctrine) as to affiliates—unless and until there is evidence of "mission creep" in the attorney-client relationship, such that all parties impliedly know that affiliates have become part of the representation. *Keefe Commissary,* 2020 WL 4673782, at *5 (distinguishing *Lennar Mare,* 105 F. Supp. 3d 1100, and *GSI Com. Sols., Inc. v. BabyCenter, LLC,* 644 F. Supp. 2d 333, 335 (S.D.N.Y. 2009), *aff'd, GSI Com.,* 618 F.3d 204, on evidence of the firm's conduct with respect to the affiliate after entering the engagement letter).

On this view, by agreeing to exclude affiliates for conflict purposes, the client is not waiving or consenting in advance to an affiliate conflict because, by definition, there is no such thing as an affiliate conflict. *See, e.g., Merial, LLC v. Fidopharm, Inc.*, No. 1:13-cv-1207-SCJ, 2016 WL 3965214, at *677 (N.D. Ga. Jan. 19, 2016) ("Before there can be a conflict, there has to be a client."); *cf. Fabick, Inc. v. Fabco Equip., Inc.*, No. 16-cv-172-WMC, 2016 WL 5718252, at *4 (W.D. Wis. Sep. 30, 2016) (enforcing engagement letter's definition of corporate client without discussing waiver or informed consent); *E2Interactive, Inc. v. Blackhawk Network, Inc.*,

No. 09-cv-629-SLC, 2010 WL 1981640, at *2, 5-6 (W.D. Wis. May 17, 2010) (same, as to amended retainer agreement's "limitation of client relationship" provision).

"[E]ngagement letters with representational disclaimers have become almost 'necessary in today's business world because so many companies are related in some way that law firms would have substantial conflict issues' without them." *Keefe Commissary,* 2020 WL 4673782, at *5 (quoting *Cliffs Sales Co. v. Am. S.S. Co.*, No. 1:07-cv-485, 2007 WL 2907323, at *3 (N.D. Ohio Oct. 4, 2007)). It would assist both the bench and bar if the ABA would expressly address whether an affiliate exclusion requires informed consent.

However, on the facts of this case. the court need not resolve the question because the record shows Elizabeth Incorporated gave informed consent to identify itself as the sole client in the Former Representation, and to exclude affiliates from being considered as clients therein for conflict purposes.

The Model Rules define informed consent as follows:

"Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

Model Rule Prof. Cond. § 1.0(e). The Colorado rule is the same.

Here, it is undisputed that Ms. Dining signed the Engagement Letter on behalf of Elizabeth Incorporated. As noted above, the letter excludes affiliates in its first substantive paragraph, which bears reemphasizing:

As discussed, our client in this matter will be Elizabeth Incorporated, hereafter referred to as the "Company." The Company may have numerous affiliates. You have agreed that our representation of the Company in the matter described below does not give rise to a lawyer-client relationship between our firm and any of the

39

Company's affiliates. Accordingly, representation of the Company in this matter will not give rise to any conflict of interest in the event other clients of the firm are adverse to any of the Company's affiliates.

Engagement Letter at 1. The last sentence of the paragraph "communicated adequate information and explanation about the material risks of" agreeing to exclude affiliates from the representation: by doing so, there will be no conflict if other clients are adverse to any affiliates. This is precisely the situation now: another client (Otter) is adverse to an affiliate (Jefferson Street). And in terms of "reasonably available alternatives" to the affiliates exclusion, the Engagement Letter overall makes plain that Elizabeth Incorporated was free to not retain M&G in the matter.

Informed consent did not require that the Engagement Letter further specify that "any of the Company's affiliates" includes both present and future affiliates. "Will not give rise" is in the future tense. Later, the Engagement Letter also states:

> **If you affiliate with**, acquire, are acquired by, or merge with **another company, you agree to provide us with sufficient notice** to permit us to withdraw as your lawyer if we determine that such affiliation, acquisition, or merger creates a conflict of interest between any of our clients and the other party to such affiliation, acquisition, or merger, or if we determine that it is not in the best interests of the firm to represent the new entity.

*Id.* at 5 (emphasis added). This provision shows that the parties agreed the Engagement Letter applies not only to present affiliates but to future affiliates as well.

Jefferson Street cites no authorities that address a contract that includes such forward looking language. The one case it cites, *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239 (2014) (quoted in K. Adams, *Reminder: Affiliates as of When?*, Adams on Contract Drafting (Sept. 9, 2014) (https://www.adamsdrafting.com/reminder-affiliates-as-of-when)), held that "[a]bsent

explicit language demonstrating the parties' intent to bind future affiliates . . . the term 'affiliate' includes only those affiliates in existence at the time." *Ellington,* 24 N.Y.3d at 246. But that case also recognizes that such language would include simply stating terms in the future tense or "forward looking language." *Id.* That is precisely what the Engagement Letter does.

The court is also not persuaded that the meaning of "affiliate" was unclear in the Engagement Letter. First, Jefferson Street did not make this argument until the hearing, and that argument contradicts its previous argument (in the Reply) which saw a supposed lack of clarity only in the present-future distinction.

Second, Jefferson Street points to no authority that the meaning of "affiliates" in the Engagement Letter is governed by anything other than Colorado's law of contracts. Under that law, the court is to apply contractual terms according to the "well-established principles of contractual interpretation" to determine the parties' intent. *Puls v. Landmark Cmty. Newspapers, Inc.*, 335 F. App'x 805, 810 (10th Cir. 2009). "[W]hen a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over' because 'in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence.'" *Id.* (quoting *Level 3 Commc'ns, LLC v. Liebert Corp.,* 535 F.3d 1146, 1154 (10th Cir. 2008)) (applying Colorado law). "Absent an indication the parties chose to deviate from the plain meaning, 'the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used.'" *Id.* (internal quotation marks omitted).

The Engagement Letter does not indicate the parties agreed to deviate from the plain meaning of the term "affiliate," which includes commonly-owned entities. *See, e.g.,* Colo. Rev. Stat. Ann. § 7-101-401(2) (under the Colorado Business Corporations statute, "'[a]ffiliate' means

any person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, the person specified"); *Puls*, 335 F. App'x at 813-14 (citing "affiliate" as defined in *Black's Law Dictionary* 64 (8th ed. 2004)). Jefferson Street identifies no contradictions in the Engagement Letter's usage of the term, nor does the court find any such contradiction.

Importantly, Ms. Dining did *not* testify that the meaning of "affiliate" was or is unclear to her. Nor did she testify that she was unsure whether the commonly-owned entity Jefferson Street is an affiliate of Elizabeth Incorporated. She has owned her own business since at least 1997. She has owned at least five business entities (Elizabeth Incorporated, cradl. ltd., Jefferson Street, and two limited liability companies not related to the cradl Phone Case Business: Newlands LLC and EBG LLC). While Ms. Dining testified that, in signing the Engagement Letter, she did not understand that if she transferred the cradl Phone Case Business to a new entity it would lose the protection of being a former client of M&G, this does not detract from the fact that in common usage, the term "affiliates" includes commonly-owned entities.

To the extent Ms. Dining's testimony is that she believed the cradl Phone Case Business would have the protection of the attorney-client relationship regardless of whether it was owned by another of her companies, the client's subjective belief does not suffice. *Cole*, 43 F.3d at 1384. That belief must also be reasonable. *Id.* Here, the express language of the Engagement Letter shows that Ms. Dining's belief was not reasonable. *Cf. Franklin Cap. Funding v. AKF, Inc.*, No. 19-CV-13562, 2020 WL 3605155, at *7 (E.D. Mich. July 2, 2020) (belief "that all of the Franklin entities were retaining Varum as counsel . . . was addressed in the letter's addendum and could have been raised during the meeting").

Ms. Dining also testified that M&G did not explain anything about the Engagement Letter before she signed it on behalf of Elizabeth Incorporated, but informed consent did not require M&G to explain the affiliates exclusion beyond what the Engagement Letter itself clearly explains. The last sentence of the letter invited Ms. Dining to call Mr. Lewis if she "would like to discuss any of these matters," Engagement Letter at 4, but Ms. Dining testified that she signed the letter without attempting to negotiate its terms.

Finally, there is no evidence of "mission creep" or implied representation of Jefferson Street after Elizabeth Incorporated entered into the Engagement Letter. M&G's only contact with Jefferson Street was in accepting Jefferson Street's payment of the invoice for Elizabeth Incorporated's trademark matter in 2017, but "[a] nonclient's payment of attorney fees on behalf of the client is insufficient" to create an attorney-client relationship. *Med Safe Nw., Inc. v. Medvial, Inc.,* 1 F. App'x 795, 801-02 (10th Cir. 2001) (citing *Turkey Creek, LLC v. Rosania,* 953 P.2d 1306, 1312 (Colo. App. 1998), *implied partial overruling recognized in Sandstrom v. Solen,* 370 P.3d 669, 674 (Colo. App. 2016)). Accordingly, even assuming that comment 34 to Rule 1.7 or Ethics Opinion 95-390 apply here despite the Engagement Letter's exclusion of affiliates, there are no circumstances in this case that would warrant treating Jefferson Street as a client of M&G.

In sum, the Engagement Letter's exclusion of affiliates bars Jefferson Street from being treated as a client for conflict purposes. Jefferson Street has not shown that it stands in the former client's shoes in the attorney-client relationship with M&G as required to satisfy the first element of Rule 1.9. And the lack of an attorney-client relationship between Jefferson Street and M&G means that Jefferson Street also cannot satisfy the third element—material adversity to the

former client. M&G's representation in this matter is adverse to Jefferson Street, but it is not adverse to Elizabeth Incorporated, an entity that indisputably has no interest in the Asserted Patents.[22]

C.    *Jefferson Street's Assertion that M&G Breached Duties to Elizabeth Incorporated.*

Finally, the court addresses Jefferson Street's assertion that M&G has breached its duties to Elizabeth Incorporated. Although Elizabeth Incorporated is a non-party, if M&G breached a duty to Elizabeth Incorporated by disclosing or using its confidential information in this case, the court has inherent powers to control M&G's conduct in this case. *See, e.g., Weeks*, 230 F.3d at 1208 ("[O]rdinarily, the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge"). Specifically, Jefferson Street argues that "M&G has now taken invalidity positions in its answer [on behalf of Otter] based on references that were specifically the subject of communications between Ms. Dining and M&G during the former representation." Reply at 16. It cites Paragraph 23 of the Counterclaims (ECF No. 21 at 40) and compares the figure of a phone case therein[23] to a photo that Ms. Dining took and sent to M&G in the Former Representation, filed in camera at ECF No. 40-2.

There is no evidence that M&G has used any confidential communications with Ms. Dining in representing Otter in this case. The similarity of the figure in Otter's pleading with the phone case in Ms. Dining's photo does not mean that M&G used anything from the Former Representation in drafting Otter's pleading. Rather, this paragraph of Otter's pleading specifically cites

---

[22] Because the first and third elements fail, the court does not reach the second element: whether this matter is substantially related to the former representation.

[23] This figure is now in Paragraph 43 of the Amended Counterclaims. ECF No. 48 at 51.

the article "Speck Announces New Cases Coming For The Samsung Galaxy S6, Galaxy S6 Edge, And HTC One M9", written by Justin Diaz and reflecting a publication date of March 1, 2015, . . . attached . . . as Exhibit 13 . . . and available at https://www.androidheadlines.com/2015/03/speck-announces-new-cases-coming-samsung-galaxy-s6-galaxy-s6-edge-htc-one-m9.html (last accessed Sept. 12, 2023).

ECF No. 48 at 51.

Moreover, Mr. Routman, M&G's general counsel, states that he implemented an ethical wall around the Former Representation when Jefferson Street asserted the conflict and that ethical wall has remained in place since. Routman Dec. ¶¶ 3-4. Mr. Beard, who was not with M&G during the Former Representation, states that he has not accessed any materials from the Former Representation, and that he prepared Otter's pleadings based on his independent knowledge and separate information. Beard Dec. ¶¶ 7-9. Jefferson Street has not pointed to any facts that call into doubt either Mr. Routman's or Mr. Beard's sworn representations.

Finally, to the extent Otter is adverse to Elizabeth Incorporated (as it is still involved in the cradl Phone Case Business as the holder of the cradl trademarks and likely the domain name registration), the Engagement Letter addresses the situation. It provides that "no individual lawyer who has done any material work for the Company will participate on behalf of the adverse party. We will also construct an ethical wall to restrict access to the Company's files [from] professionals who have done work for the adverse party." Engagement Letter at 3. Thus, M&G is obligated to maintain the ethical wall that is already in place, and there is no evidence to suggest that M&G will fail to do so. Jefferson Street complains that the Denver office of M&G is small, with only six lawyers, and doubts the efficacy of an ethical wall in that context. But this is sheer speculation; there is no evidence that the relatively small size of M&G's Denver office will

lessen the effectiveness of the ethical wall, and there are no facts suggesting that M&G has breached or will breach its duties to Elizabeth Incorporated.

In sum, based on a careful review of the entire record, this court finds no grounds for employing the extreme remedy of disqualification.

IV.    Conclusion

Consistent with the foregoing, the motion to disqualify is DENIED.[24] The parties shall email chambers within **three business days** after (a) the deadline to object, if no objection to this order is timely filed, or (b) the resolution of a timely-filed objection to this order, to set the scheduling conference in this case.

DATED:  November 14, 2023                    BY THE COURT:

_____
Susan Prose
United States Magistrate Judge

---

[24] Rule 72 of the Federal Rules of Civil Procedure provides that within fourteen (14) days after service of a Magistrate Judge's order or recommendation, any party may serve and file written objections with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. §§ 636(b)(1)(A), (B); Fed. R. Civ. P. 72(a), (b). Failure to make any such objection will result in a waiver of the right to appeal the Magistrate Judge's order or recommendation. *See Sinclair Wyo. Ref. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 782 (10th Cir. 2021) (firm waiver rule applies to non-dispositive orders); *but see Morales-Fernandez v. INS*, 418 F.3d 1116, 1119, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review, including when a "pro se litigant has not been informed of the time period for objecting and the consequences of failing to object").